NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12384

MILLIS PUBLIC SCHOOLS  vs.  M.P. & others.[1]

Norfolk.      October 2, 2017. - February 6, 2018.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
& Kafker, JJ.

Child Requiring Assistance.  Statute, Construction.  Words,
    "Wilfully."

Petition filed in the Norfolk County Division of the
Juvenile Court Department on November 30, 2016.

The case was heard by Mary M. McCallum, J.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.

Katrina McCusker Rusteika, Committee for Public Counsel
Services, for M.P.

LENK, J.  The children requiring assistance (CRA) statute,

G. L. c. 119, §§ 21, 39E-39I, confers jurisdiction upon the

Juvenile Court to intervene in the custody arrangements of

_____

[1] The mother and father of M.P.

children who are, inter alia, "habitually truant," meaning that they "willfully fail[] to attend school for more than [eight] school days in a quarter."  G. L. c. 119, § 21.  The statute is aimed at children who exhibit "misbehavior which is not violative of any criminal statute, but which is the cause for concern that it is indicative of problems or tendencies that may eventually lead to delinquent or criminal activity."  R.L. Ireland & P. Kilcoyne, Juvenile Law § 4.1 (2d ed. 2006 & Supp. 2017) (Ireland & Kilcoyne, Juvenile Law).  In such cases, the Juvenile Court is tasked with examining the children's circumstances and determining whether changing or placing conditions on their custody arrangements will help deter their potentially harmful behaviors.  Id.  The party that initiates a CRA proceeding must prove the allegations beyond a reasonable doubt.  G. L. c. 119, § 39G.

In this case, we decide whether a child, M.P., who has failed continually to attend school due to a combination of physical and mental disabilities, including a severe bladder condition and autism, was properly adjudicated as a child requiring assistance on the basis of a habitual truancy CRA petition filed by the Millis public schools (school district).[2] To make this determination, we must address the novel question

_____

[2] Millis public schools did not participate in this appeal.

of what it means for a child to "willfully fail[] to attend school." In light of the CRA statute's goal of deterring delinquency, the statutory requirement that a child's failure to attend school be wilful reflects legislative concern as to why the child is regularly skipping school: it contemplates purposeful conduct by the child. The wilfulness requirement thus necessitates judicial inquiry into and assessment of the child's reasons for not attending school. When the child's repeated failure to attend school arises from reasons portending delinquent behavior, it is wilful under the statute. Using the definition we set forth today, the evidence in the record does not support a finding beyond a reasonable doubt that M.P. "willfully fail[ed] to attend school."

1. Background. a. Statutory scheme. The Juvenile Court has jurisdiction over three primary areas: delinquency and youthful offender cases, care and protection matters, and CRA proceedings. G. L. c. 119, §§ 26, 39E, 54. Children in CRA proceedings often are said to have committed "status offenses," because the statute is "couched in terms of the child's condition rather than in terms of the commission of specific acts" (citation omitted). See Ireland & Kilcoyne, Juvenile Law, supra at § 4.1. Unlike children who are adjudicated delinquent, children requiring assistance have not committed wrongdoing

against another or against society, but, rather, are deemed to be acting against their own interests.  See id.

The CRA statute defines a child requiring assistance as one who is between the ages of six and eighteen and who "(i) repeatedly runs away from the home of the child's parent, legal guardian or custodian; (ii) repeatedly fails to obey the lawful and reasonable commands of the child's parent, legal guardian or custodian, thereby interfering with their ability to adequately care for and protect the child; (iii) repeatedly fails to obey the lawful and reasonable regulations of the child's school; (iv) is habitually truant; or (v) is a sexually exploited child."  G. L. c. 119, § 21.  As relevant here, the CRA statute defines one who is "[h]abitually truant" as "a school-aged child, not excused from attendance under the lawful and reasonable regulations of such child's school, who willfully fails to attend school for more than [eight] school days in a quarter."  Id.

CRA proceedings are initiated when a parent, legal guardian, custodian, or school district files an application in the Juvenile Court for issuance of a petition that seeks a determination that the child requires assistance.  G. L. c. 119, § 39E.  Upon this filing, the court issues a summons requiring the child and his or her parents or guardian to appear before it.  Id.  A Juvenile Court judge then conducts a preliminary

hearing to determine whether the petition should issue.[3]  Id.  At this hearing, the judge may decline to accept the application because there is "no probable cause to believe that the child and family are in need of assistance," or because "the interests of the child would best be served by informal assistance, in which case the [judge] shall, with the consent of the child and the child's parents or guardian, refer the child to a probation officer for assistance."  Id.  Alternatively, a judge may accept the application and schedule a fact-finding hearing.  Id.  In order for a judge ultimately to find that the child requires assistance, the petitioner must prove the allegations of the petition beyond a reasonable doubt.  G. L. c. 119, § 39G.

Only after a child is proved habitually truant beyond a reasonable doubt should the judge contemplate changes to the child's custody arrangements.  G. L. c. 119, § 39G.  The judge, "taking into consideration the physical and emotional welfare of the child, may make any of the following orders of disposition": (1) permit the child to stay with the parents, custodians, or guardians, subject to conditions and limitations that the court

---

[3] Both the child and the parents or legal guardians have a right to counsel at all stages of CRA proceedings.  G. L. c. 119, § 39F.

may choose;[4] (2) place the child in the care of a relative,
probation officer, other qualified adult, private charitable or
childcare agency, or other authorized or qualified private
organization, subject to conditions and limitations; or
(3) place the child in the custody of the Department of Children
and Families.  G. L. c. 119, § 39G.  The disposition is not a
direct order requiring the child to comply with the conditions,
however, and the judge may not impose penalties for criminal
contempt for the child's failure to comply.[5]  See Commonwealth v.
Florence F., 429 Mass. 523, 524-525 (1999).

b.  Factual background.  We summarize the Juvenile Court
judge's findings of fact concerning M.P., supplemented with
certain uncontested facts in the record.  See Chin v. Merriot,
470 Mass. 527, 529 (2015).

i.  Medical conditions.  M.P. is a fifteen year old girl
who has been diagnosed with significant detrusor sphincter
discoordination (bladder condition), autism spectrum disorder

---

[4] These conditions include "provision for medical,
psychological, psychiatric, educational, occupational, and
social services, and for supervision by a court clinic or by any
public or private organization providing counseling or guidance
services."  G. L. c. 119, § 39G.

[5] The order of disposition is effective for 120 days, and
may be extended for three additional periods of up to ninety
days each.  G. L. c. 119, § 39G.  After that, a new hearing is
required.  See Matter of Hilary, 450 Mass. 491, 493-494 (2008).
The disposition is no longer effective after the child's
eighteenth birthday.  G. L. c. 119, § 39G.

(autism), anxiety disorder, obsessive-compulsive disorder (OCD), and posttraumatic stress disorder (PTSD).[6]  Her bladder condition is such that she has difficulty voiding, and when she does so, she usually "leaves behind a large volume of urine."  As a result, she needs to use the restroom frequently, often for hours at a time.  This condition makes her predisposed to urinary tract infections.  She also has an abnormally large bladder.  M.P. has experienced this condition since the age of six, when she underwent a surgical procedure for her urinary tract.[7]

M.P.'s bladder condition is compounded by her numerous cognitive and emotional disorders.  In kindergarten she was diagnosed with "pervasive developmental disorder, not otherwise specified"; this nomenclature is now subsumed under the

---

[6] The Juvenile Court judge's findings of fact omitted M.P.'s diagnoses of anxiety disorder, OCD, and PTSD.  These diagnoses, however, were contained in both doctors' letters and in service providers' notes, the same medical records upon which the judge relied without qualification.

[7] In May, 2017, one of M.P.'s doctors prescribed a new bladder relaxation medication in the hopes of improving her condition.  The fact-finding hearing in this case took place in the same month that this medication was prescribed; accordingly, the record is silent as to the effectiveness of this medication.

diagnosis of autism.  In December, 2016, a child neurologist confirmed that M.P. meets the criteria for autism.[8]

The child neurologist further opined that M.P. exhibits many symptoms of OCD and has a "number of difficulties processing sensory information -- she does not like to change her clothes and some sounds are really bothersome."  Relatedly, a developmental pediatrician noted that M.P.'s autism and OCD cause her to fixate on "obsessive rituals and rigidities that control every aspect of her daily life."  M.P. feels that she cannot leave the house until her bladder is completely empty, which typically takes hours.  If she hears noises while she is in the restroom, she has to begin her process of voiding from the beginning.  She has difficulty tolerating busy and unpredictable settings and cannot use public restrooms.  At one point, in order to obtain a medical evaluation, her family had to rent a nearby hotel room so that M.P. could have a "safe and comfortable place to use the bathroom."  Her anxiety regarding

---

[8] The judge noted that, while the child neurologist shared her opinions in writing with M.P.'s school district in February, 2017, "no neurological testing results, evaluation information, data, or the like were shared with the school.  It is unclear whether any such neurological testing, evaluation, etc.  actually was conducted.  [The child neurologist] provided her opinion based on her review of the literature . . . [and M.P.'s] medical and educational history combined with her one appointment with the child [in December, 2016]."  The judge did not, however, express any doubt as to whether M.P. has autism, nor does the record suggest any reason to doubt this diagnosis.

her bladder condition is so great that she sleeps on a couch close to the bathroom, rather than in her own bed. She also often will hold her urine until her parents go to sleep.

M.P. also has aversions to many practices for ordinary hygiene. She refuses to use feminine hygiene products or wear appropriate seasonal clothing. She will not shower at home and has only taken two showers in the past year, choosing instead to clean herself with body wipes that in turn cause skin irritation. She previously has been sent home from school for offensive body odor. M.P. has almost no social or peer contact outside her family.

In February, 2017, the developmental pediatrician concluded that M.P.'s anxiety and OCD were associated with PTSD. She opined that M.P. has medical necessity for direct one-to-one "home based, behavioral therapy services utilizing Applied Behavioral Analysis to target functional communication, social pragmatics and other skills in order to generalize skills across environments from the school to the home and general community." In addition, the pediatrician observed that the CRA proceeding, as described below, had "further impact[ed] [M.P.'s] wellbeing with escalating anxiety and sadness and resultant worsening of her emotional fragility and function." She reported that M.P. was "not sleeping and [wa]s filled with anxiety regarding the

outcome of [the] case," and urged that the CRA case "be dropped at once out of medical necessity."

ii. <u>School attendance</u>. M.P. initially was enrolled in an online high school, but her parents decided to place her in the Millis public school system for the 2016-2017 year in order to obtain special education services.[9] She did not attend classes from the first day of school on August 31, 2016, through October 20, 2016. At the start of the school year, the school district conducted an evaluation and the special education team recommended that M.P. attend an extended forty-five day evaluation in a therapeutic setting, because the school district did not believe it could provide the services that M.P. required. The school district enrolled her in the ACCEPT Collaborative Therapeutic program from October 21, 2016, until January 6, 2017, which provided her with a shortened school day. Under this program, M.P. attended only nine shortened school days, for a total of 10.5 hours of learning time.

The school district then arranged for home-based services for M.P. through a private provider, beginning on December 27, 2016. A service provider began meeting with M.P. at her house from 9 <u>A</u>.<u>M</u>. until 11 <u>A</u>.<u>M</u>., Monday through Thursday, to help her

_____

[9] Although the school district initially enrolled M.P. as a ninth grader for the 2016-2017 year, later that year she was offered enrollment at Keough Memorial Academy, a special education day school, as an eighth grader.

prepare to leave the house. The provider arranged for tutoring at home, and then helped her transition to tutoring at the library; M.P. demonstrated increased ability to leave the house and was making "great strides." Notably, after a few weeks, the provider changed the meeting time to 12 P.M., to accommodate both the schedule of the library and the tutor. The provider explained that when M.P. had a clear understanding of what was expected of her, she was successful in leaving the house with him. Occasionally, however, M.P. continued to be unable to leave the bathroom for long periods of time. Additionally, of the thirty sessions scheduled between December 27, 2016, and February 21, 2017, M.P.'s family canceled eight times (once for a holiday and once for an appointment, but otherwise for reasons that are not known) and the home-based service provider canceled four times (three times due to weather conditions, and one time for reasons unknown). M.P. was able to attend 55.5 per cent of the scheduled tutoring sessions, for a total of 33.5 hours.

On March 13, 2017, M.P. was enrolled in Keough Memorial Academy (Keough Memorial), a special education day school designed for children with emotional disabilities, and was to begin classes on March 29 of that year. Keough Memorial educators were aware of M.P.'s disabilities and were confident that they could meet her needs. M.P. was to continue with the home-based service provider while attending Keough Memorial, and

the school district made an exception to permit the provider to meet M.P. on weekends, not just on school days, to help her maintain a routine. The provider then attempted to change his appointments with M.P. back to 9 $\underline{A}.\underline{M}$., so that she could be ready in time for the Keough Memorial school day. After this change, the family canceled the home-based provider sessions more frequently; of the twenty-four appointments scheduled between February 22 and May 2, 2017, M.P.'s family canceled twelve (once for an illness and once for an appointment, but otherwise for unknown reasons) and the home-based provider canceled three (once due to weather conditions, once because of M.P.'s health, and once because of "unclear . . . expectations").

Between April 5 and April 28, 2017, the home-based provider did not schedule any appointments because the provider wanted to meet M.P. in the morning, but the family wanted him to come in the afternoon. The provider testified, however, that M.P. never said that she did not want to go to school; to the contrary, M.P. communicated to him that she did want to attend. By May 1, 2017, M.P. had attended only eight shortened days at Keough Memorial, for a total of 7.9 learning hours. She typically arrived near the end of the school day.

As of April 20, 2017, M.P. also became eligible for services with the Department of Developmental Services. That

month, the family arranged to have an applied behavior analyst from an independent organization provide an initial assessment of M.P. In his initial report, the analyst noted that her behavior "poses a serious risk to the health and wellbeing of herself and her family," and that her behaviors and anxieties had persisted and intensified despite her parents' provision of several accommodations and modifications. The analyst stated that M.P.'s "challenging behavior" arose from pain and discomfort due to complications regarding her bladder retention, which was an "automatic" or "internal" function.

As of the time of the fact-finding hearing, the analyst had met with M.P. only a few times, but he stated that an applied behavior analysis therapist would soon work with M.P. for eighteen hours per week. He anticipated that M.P. would need treatment for from six months to one year. He also explained that M.P. conveyed on "many occasions" that "she's very excited" to start the program and loves school; she had been crying daily because of her inability to attend school.

iii. CRA proceedings. On November 30, 2016, just a few months after M.P.'s initial enrollment in the Millis public schools, the school district filed a CRA petition, alleging that M.P. was a child requiring assistance on the grounds that she was habitually truant. A Juvenile Court judge held a preliminary hearing on December 14, 2016, and accepted the

petition.[10]  The judge then scheduled a fact-finding hearing for January 19, 2017, which was continued twice.  A two-day fact-finding hearing took place on May 4 and 26, 2017.

At the conclusion of the fact-finding hearing, the judge found that M.P. was habitually truant and adjudicated her a child requiring assistance.  The judge noted that, under the CRA statute, a child's failure to attend school must be wilful, which the judge defined as "acting intentionally, as opposed to accidentally or involuntarily."  She concluded that "[a]lthough . . . [M.P.'s] actions of failing to attend school have been attributed to her medical conditions and emotional challenges, they are still actions taken by the child not to attend school."  The judge noted that none of M.P.'s assessments indicated that she "was either home bound or unable to benefit from an education," and that there was no evidence indicating that M.P. should be exempt from school.

The judge further found that M.P.'s parents "are now working hard to obtain additional therapeutic services for their daughter so that she can attend school."  She stated that "[m]any of the therapeutic services assessed by the parents were pursued after the commencement of this CRA petition, while the home based therapeutic services offered by the school were not

_____

[10] The record does not provide the basis for the judge's decision to accept the CRA petition.

consistently utilized by the child or the parents." Ultimately, however, the judge decided that M.P. "appears to be receiving appropriate services and no further services need be ordered at this time," and did not alter M.P.'s custody arrangements. Nonetheless, the judge stated that later dispositional review would be necessary to determine whether the newly implemented services, meaning the sessions with the applied behavior analyst, were sufficient. The judge also excused M.P. from attending future hearings, noting that her time would be better spent in school, rather than in the CRA hearings, which "increase[d] her stress."

M.P. appealed from the CRA determination to a single justice of the Appeals Court, pursuant to G. L. c. 119, § 39I. The single justice referred the case to a full panel of the Appeals Court. We then transferred the case to this court on our own motion. The school district did not participate in the appeal.

2. Discussion. There is no dispute that M.P. missed more than eight days of school in each quarter of the 2016-2017 school year, and that most of her absences were not excused "under the lawful and reasonable regulations of such child's

school."[11]  See G. L. c. 119, § 21.  The question before us is whether she "willfully fail[ed] to attend school."  Id.  This court has not previously examined the meaning of this language. We conclude that the CRA statute's habitual truancy provision requires purposeful conduct by the child.  When the child's repeated failure to attend school arises from reasons portending delinquent behavior, it is wilful under the statute.

a.  Plain meaning.  We review questions of statutory interpretation de novo.  Massachusetts Insurers Insolvency Fund v. Smith, 458 Mass. 561, 564-565 (2010).  In order to determine what it means to "willfully fail[] to attend school," we turn first to the plain meaning of the statutory language.  "Where the language is clear and unambiguous, it is to be given its 'ordinary meaning.'"  Commonwealth v. Mogelinski, 466 Mass. 627, 633 (2013).  The plain meaning of a statute "must be reasonable and supported by the purpose and history of the statute."  Id., quoting Wright v. Collector & Treas. of Arlington, 422 Mass. 455, 457-458 (1996).

We look initially "to dictionary definitions as a guide to a term's plain or ordinary meaning."  Commonwealth v. Samuel S., 476 Mass. 497, 501 (2017).  One dictionary defines "willful" as "done deliberately" or "intentional," and "not accidental or

_____

[11] M.P. does not challenge the lawfulness or reasonableness of her school's regulations regarding truancy.

without purpose." Webster's Third New International Dictionary 2617 (1993). According to Black's Law Dictionary, "willful" means "[v]oluntary and intentional, but not necessarily malicious." Black's Law Dictionary 1834 (10th ed. 2014). Black's Law Dictionary further states, however, that a "voluntary act becomes willful in law, only when it involves conscious wrong or evil purpose on the part of the actor, or at least inexcusable carelessness, whether the act is right or wrong." Id. Thus, some definitions focus on the actor's purpose, while others focus only on whether the actor's conduct was voluntary or intentional.

Nor does wilfulness have a consistent meaning in our jurisprudence. In the adoption context, we have explained that, while wilfulness implies intentional conduct, it does not require ill will. See Adoption of a Minor, 343 Mass. 292, 297 (1961) (statute permitting adoption without consent of parent where parent wilfully deserts or neglects child "does not require that the neglect to provide be done with malevolence or ill will; it is enough if the conduct resulting in the failure to provide was not unintentional"). In criminal cases, on the other hand, we have held that conduct is wilful "when the actor intends both the conduct and its harmful consequences." Commonwealth v. Frith, 458 Mass. 434, 443 (2010), quoting Commonwealth v. Schuchardt, 408 Mass. 347, 352 (1990). See

Commonwealth v. McDonald, 462 Mass. 236, 242 (2012).
Nonetheless, "in only a few select areas of law does 'willfully'
require a showing of an intent to violate a known legal duty."
Franklin Office Park Realty Corp. v. Commissioner of the Dep't
of Envtl. Protection, 466 Mass. 454, 456, 464 n.12 (2013)
(rejecting argument that wilfulness, as used in G. L. c. 21A,
§ 16 [administrative penalties act], requires knowledge that
"conduct will or may constitute a violation of applicable
environmental standards," and instead holding that wilfulness
only requires that "party who has not complied with the law knew
or should have known of the operative facts that made their acts
unlawful").

The question remains, then, whether wilfulness under the
CRA statute's habitual truancy provision implies merely
voluntary or intentional conduct, or also necessitates inquiry
into a student's purpose in missing school.

b. Legislative history. As the term "willfully" may have
several meanings when read in isolation, we turn to the broader
statutory context and legislative history of the CRA statute to
ascertain the intended meaning. See Franklin Office Park Realty
Corp., 466 Mass. at 463 ("Although 'willful' may have several
meanings when read in isolation, its meaning in any particular
statute may be determined from examining the act itself as well
as the larger statutory scheme").

The habitual truancy provision dates back to 1873, when the Legislature enacted a statute requiring each city and town in Massachusetts to impose criminal penalties for "habitual truants." See St. 1873, c. 262 § 3 ("An Act concerning truant children and absentees from school"). The legislation was enacted in response to a report from the Board of Education, which had collected numerous school committee reports complaining of a lack of proper enforcement mechanisms to address widespread truancy.[12] See id.; Thirty-Sixth Annual

---

[12] For example, the school committee of Barnstable noted that four-fifths of the crimes in New England were committed by those who had not been educated, and "[o]f juvenile offenders, ninety-five hundredths [were] from ignorant and idle homes, and a large number of them were truants from school at the time of arrest." Thirty-Sixth Annual Report of the Board of Education, Abstracts of School Committee Reports, at 3 (Jan. 1873). Peabody's committee stated that the practice of sending truant children to almshouses had done little to combat the growing problem of truancy, and called for "habitual truants" to face criminal sentences. Id. at 89-90. Salem's committee touted its then recently enacted ordinance criminalizing truancy as a means of deterrence. Id. at 94. Cambridge's committee, in turn, attributed the majority of its truancy cases to the "indifference, neglect or parsimony of parents," and stated that "reformatory institutions" were better than almshouses for addressing truancy. Id. at 121-122. Malden's superintendent of public schools stated that truant children required greater attention because other pupils "[were] led to imitate their bad practices, and thus the evil [had] increased to no small magnitude." Id. at 139. Wakefield's school committee stated that "[i]gnorant boys [could] be seen every day in [the town's] streets with nothing but mischief to occupy their time. Their parents [were] too indifferent to their welfare, or too imbecile to send them to school," and called for "strict enforcement" of compulsory education. Id. at 147. Clinton's committee chairman also called for trial judges to handle cases of truancy, noting

Report of the Board of Education, Abstracts of School Committee
Reports (Jan. 1873).

A century later, Governor Francis W. Sargent and others
recognized that to send habitual truants and other status
offenders "away from their homes to an institution which
deprives them of their liberty and individuality and, at times,
inflicts physical punishment and harassment, is to blame the
victims of society's neglect and to hinder their eventual
rehabilitation."  See F.W. Sargent, Letter to the Senate and
House of Representatives (Nov. 20, 1972), 1973 House Doc. No.
5593.  As then Governor Sargent explained, "we now know that
there is an alternative to institutionalization -- community
based treatment.  It is better for the child and better for the
taxpayers."  Id.

Thus, the Legislature enacted the children in need of
services (CHINS) statute, the predecessor of the CRA statute, in
1973.  The CHINS statute decriminalized status offenses such as
truancy by removing them from the delinquency jurisdiction of

that its local truancy officer was ill-equipped to address the
problem.  Id. at 202-203.  Westborough's school committee
chairman attributed the problem of truancy to the indifference
of parents who were often "ignorant" themselves and advocated
for a "board of truant officers."  Id. at 219.  Worcester's
truant school committee also noted that its truant officer was
overburdened and that the children who were "not sent to school
at all" were those whom it considered the "children most sinned
against."  Id. at 230.

the Juvenile Court and tasking Juvenile Court judges with providing "nonpunitive care to address the problem of certain children."  See Florence F., 429 Mass. at 527, citing St. 1973, c. 1073; Ireland & Kilcoyne, Juvenile Law § 4.2.  Notably, the CHINS statute defined a "child in need of services" on the grounds of truancy in almost the same language as does the current CRA statute:  as a child who is "between the ages of six and sixteen who persistently and wilfully fails to attend school."  See 1973 Senate Doc. No. 1922; 1973 House J. 3941.  The statute's inclusion of habitual truants is consistent with the Legislature's recognition that education is vital to a child's progress.  See, e.g., Care & Protection of Charles, 399 Mass. 324, 335 (1987) ("[c]ompulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education . . . .  It is the very foundation of good citizenship.  Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment" [citation omitted]).

CHINS proceedings were intended to target children who "fall between the chairs, so to speak.  They are not the dependent children who are clearly entitled to the full protection of the [J]uvenile [C]ourt.  Neither are they law breakers entitled to whatever firm or lenient treatment the law

or individual judge feels appropriate for such offenders."
Florence F., 429 Mass. at 528, quoting In re Ronald S., 69 Cal.
App. 3d 866, 869 (1977).  The goals of the CHINS statute were
"(a) preventing delinquency involvement; (b) fostering the
pursuit of education; and (c) providing support to families
during periods of emotional turbulence."  Ireland & Kilcoyne,
Juvenile Law, supra at § 4.5.  See id. at § 4.1 ("the court's
approach is that through the provision of certain rehabilitative
or preventive services . . . the child will be diverted from the
tendency to engage in future delinquent behavior").

The CHINS statute was significantly amended in 2012, when
it was reformulated as the CRA statute, but the overarching
purpose of the statute did not change.  The 2012 amendments were
enacted in response to the Legislature's recognition of the
CHINS statute's failure to "[keep] children out of the juvenile
justice system as the [L]egislature intended."  See Press
Release, Governor Patrick Signs Legislation to Reform Children
in Need of Services System (Aug. 7, 2012).  The amendments
sought to achieve this goal by making proceedings less
adversarial, and to "divert cases from the courts into a system
of community-based service providers."[13]  Senate OK's Changes on

---

[13] The amendments provided for the establishment of a system
of community-based resources and assistance to families to
coordinate screenings, assessments, and referrals, and required

Runaways, Truants, State House News Service, July 15, 2011.  The CRA statute treats involvement of the Juvenile Court system as something of a last resort.  See G. L. c. 119, § 39E (before CRA petition is filed, "the clerk shall inform the petitioner that the petitioner may delay filing the request and choose to have the child and the child's family referred to a family resource center, community-based services program or other . . . community-based services in the [J]uvenile [C]ourt district where the child resides and return to court at a later time to file an application for assistance, if needed"; clerk also is required to "prepare, publish and disseminate to each petitioner educational material relative to available family resource centers, community-based services programs and other entities designated by the [S]ecretary of [H]ealth and [H]uman services").

Proponents of the CRA statute reasoned that "the current studies suggest[ed] that children . . . who are regularly

school districts to establish truancy prevention programs for habitually truant students before referring them to the Juvenile Court.  See R.L. Ireland & P. Kilcoyne, Juvenile Law § 4.1 (Supp. 2017).  The revisions also made CRA proceedings confidential; adjusted the adjudication procedures by, inter alia, removing the provisions for a jury trial; and provided that, where a child was in need of assistance, he or she no longer could be placed with the Department of Youth Services or shackled and restrained in a delinquent juvenile facility, but could be placed with the Department of Children and Families. See id.

exposed to the courts are more likely to be involved in serious crimes later in life."  Senate OK's Changes on Runaways, Truants, supra.  See Lawmakers, Advocates Urge Overhaul of Child Services System, State House News Service, Mar. 30, 2011 ("Arguing that the [S]tate's [thirty-eight year old] system of services for troubled children forces them into the court system prematurely and can tear families apart, lawmakers and advocacy groups called yesterday for an overhaul of the system"); State House Rally Calls for Children's Services Reform, MetroWest Daily News, June 28, 2012; Politicians Push for New Way to Deal with Troubled Kids, MetroWest Daily News, Mar. 30, 2011 (Reis) ("Advocates, parents and graduates of Children in Need of Service argue early court involvement can push adolescents into a life of crime").  Although CRA determinations are not entered on children's juvenile records, see G. L. c. 119, § 39E, proponents noted that the mere fact of children's involvement with the Juvenile Court stigmatizes them and makes them "more likely to be involved in serious crimes later in life."  See State Capitol Briefs, State House News Service, July 14, 2011. See, e.g., Lawmakers Push New System to Serve Troubled Kids, State House News Service, Oct. 6, 2009; Politicians Push for New Way to Deal with Troubled Kids, supra.

As Senator Karen Spilka, the lead Senate sponsor of the CRA bill, explained:

"[The CHINS statute] began with good intentions. Its goal was to prevent children from entering the juvenile justice system. But the irony of this is that the court system was telling parents and families to go to this system, so we were sending messages that didn't make sense. We heard time and time again after many meetings that parents and children should not have to go to court to get services. The second thing we were hearing was focusing on the children's behavior, and this was an adversarial system. This was not bad for all families but it tore a lot of them apart. . . . The third thing was that each community needs to have services available for children[] and families; this is faster, easier, and resolves issues more quickly. . . . This bill removes labels from children and removes stigma from them . . . . [T]hat is a wonderful thing."

2011 House Doc. No. 3492, Senate Floor Debate, July 12, 2011.

Therefore, as with the CHINS statute, the purpose of the CRA statute is to "address the root causes of juvenile delinquency." State House Rally Calls for Children's Services Reform, supra. The legislative history and statutory scheme as a whole demonstrate that in order to determine whether a child has "willfully fail[ed] to attend school," a Juvenile Court judge must examine the child's purpose or reasons for being absent, so that the judge can decide whether the student's behavior arises from reasons portending delinquent behavior.

c. Authority in other jurisdictions. Nearly every State has a statute authorizing courts or law enforcement officers to intervene in the custody arrangements of children who are in need of services or supervision because, inter alia, they have run away from home, are truant, are beyond the control of their

parents or guardians, or otherwise are jeopardizing their own welfare or that of others.[14]  Although most of these statutes

---

[14] See, e.g., Ala. Code §§ 12-15-201(4), 12-15-215; Alaska Stat. §§ 47.10.011, 47.10.142(e); Ariz. Rev. Stat. Ann. §§ 8-201(19), 8-341(A)(2), 15-803(B); Ark. Code Ann. §§ 9-27-303(24), 9-27-322; Cal. Welf. & Inst. Code § 601; Conn. Gen. Stat. §§ 46b-120(5), 46b-149; Del. Code Ann. tit. 10, § 921(6)(b); D.C. Code §§ 16-2301(8), 16-2320(c); Fla. Stat. §§ 984.03(9), 984.22(2); Ga. Code Ann. §§ 15-11-2(11), 15-11-381, 15-11-442; Haw. Rev. Stat. § 571-11(2)(B)-(D); Idaho Code Ann. § 20-505; 705 Ill. Comp. Stat. 405 / §§ 3-3, 3-24, 3-33.5; Ind. Code §§ 31-34-1-6, 31-34-20-1; Kan. Stat. Ann. §§ 38-2022(d), 38-2253; Ky. Rev. Stat. Ann. §§ 159.150, 630.020, 630.120; La. Child. Code Ann. arts. 728, 730, 779; 15 Me. Rev. Stat. § 3501; Md. Code Ann., Cts. & Jud. Proc. § 3-8A-01(e), 3-8A-19; Mich. Comp. Laws § 712A.2(a)(4); Minn. Stat. §§ 260C.007(6), 260C.201; Miss. Code Ann. §§ 43-21-105(k), 43-21-607; Mo. Rev. Stat. § 211.031; Mont. Code Ann. §§ 41-5-103(22), (51), 41-5-1512; Neb. Rev. Stat. § 43-247; Nev. Rev. Stat. § 62B.320; N.H. Rev. Stat. Ann. §§ 169-D:2(II), 169-D:17; N.J. Stat. Ann. §§ 2A:4A-83, 2A:4A-89; N.M. Stat. Ann. §§ 32A-3B-2, 32A-3B-16; N.Y. Fam. Ct. Act § 712(a), 754; N.C. Gen. Stat. §§ 7B-1501(27), 7B-2503; N.D. Cent. Code §§ 27-20-02(19), 27-20-32; Ohio Rev. Code Ann. §§ 2151.022, 2151.354; 2017 Okla. Sess. Laws c. 254 (S.B. 718) (enacted 2017); Or. Rev. Stat. § 419B.100; 42 Pa. Cons. Stat. §§ 6302 ("[d]ependent child"), 6351; R.I. Gen. Laws §§ 14-1-3(9), 14-1-32;  S.C. Code Ann. §§ 63-19-20(9), 63-19-1440; S.D. Codified Laws §§ 26-8B-2, 26-8B-6; Tenn. Code Ann. §§ 37-1-102(26), 37-1-132; Tex. Fam. Code Ann. §§ 51.02(15), 51.03(b), 54.05; Utah Code Ann. §§ 53A-11-101, 78A-6-103, 78A-6-105(18); Vt. Stat. Ann. tit. 33, §§ 5102, 5318; Va. Code Ann. §§ 16.1-228 ("[c]hild in need of services"), 16.1-278.4, 16.1-278.6; Wash. Rev. Code §§ 43.185C.260, 28A.225.030; W. Va. Code §§ 49-1-202 ("[s]tatus offender"), 49-4-712; Wyo. Stat. Ann. §§ 14-6-402(a)(iv), 14-6-429.  Colorado had similar provisions, which have since been repealed.  Colo. Rev. Stat. § 19-1-103(5), (20)(f), repealed by Laws 1994, S.B. 94-21, § 1 (effective July 1, 1997).  The Wisconsin and Iowa statutes concerning children in need of services or supervision only cover children who are the subject of abandonment, abuse, or neglect, rather than those who are deemed to be engaging in improper or injurious behavior. See Iowa Code §§ 232.2(6), (20), 232.102; Wis. Stat. § 48.13.

include provisions on truancy,[15] only Massachusetts and five other States (Michigan, Mississippi, New Hampshire, Oklahoma, and Rhode Island) have statutory language that expressly includes a wilfulness component in the truancy provision.[16]

---

[15] See, e.g., Ala. Code § 12-15-201(4); Ariz. Rev. Stat. § 8-201(19)(b); Ark. Code Ann. § 9-27-303(24)(A); Cal. Welf. & Inst. Code § 601; Conn. Gen. Stat. § 46b-120(5); D.C. Code § 16-2301(8)(A)(i); Fla. Stat. § 984.03(9); Ga. Code Ann. § 15-11-2(11); Haw. Rev. Stat. § 571-11(2)(C); 705 Ill. Comp. Stat. 405 / § 3-33.5; Kan. Stat. Ann. § 38-2022(d)(6); Ky. Rev. Stat. Ann. §§ 159.150, 630.020(3); La. Child. Code Ann. art. 730(1); Md. Code Ann., Cts. & Jud. Proc. § 3-8A-01(e)(1); Mich. Comp. Laws § 712A.2(a)(4); Minn. Stat. § 260C.007(6)(14), (19); Miss. Code Ann. § 43-21-105(k)(ii); Mo. Rev. Stat. § 211.031(1)(2)(a); Mont. Code Ann. § 41-5-103(22), (51); Neb. Rev. Stat. § 43-247(3); Nev. Rev. Stat. § 62B.320(1)(a); N.H. Rev. Stat. Ann. § 169-D:2(II)(a); N.M. Stat. Ann. § 32A-3B-2(A); N.Y. Fam. Ct. Act § 712(a); N.C. Gen. Stat. §§ 7B-1501(27)(a), 7B-2503; N.D. Cent. Code § 27-20-02(19); Ohio Rev. Code Ann. §§ 2151.022, 2151.354; 2017 Okla. Sess. Laws c. 254 (S.B. 718); 42 Pa. Cons. Stat. § 6302; R.I. Gen. Laws §§ 14-1-3(9), 14-1-32; S.C. Code Ann. § 63-19-20(9); S.D. Codified Laws § 26-8B-2(1); Tenn. Code Ann. § 37-1-102(26)(A); Tex. Fam. Code Ann. § 51.02(15)(C); Utah Code Ann. §§ 53A-11-101, 78A-6-103(1)(i), 78A-6-105; Vt. Stat. Ann. tit. 33, §§ 5102(3)(D), 5318; Va. Code Ann. § 16.1-228; Wash. Rev. Code §§ 43.185C.260, 28A.225.030(4); W. Va. Code § 49-4-712; Wyo. Stat. Ann. § 14-6-402(a)(iv).

[16] Mass. G. L. c. 119, § 21 ("[c]hild requiring assistance" includes one who is "habitually truant," meaning he or she "willfully fails to attend school for more than [eight] school days in a quarter"); Mich. Comp. Laws § 712A.2(a)(4) (family court has jurisdiction over, inter alia, juvenile who "willfully and repeatedly absents himself or herself from [a] school or other learning program intended to meet the juvenile's educational needs"); Miss. Code Ann. § 43-21-105(k)(ii) ("[c]hild in need of supervision" includes one who "willfully and habitually absents himself" from school); N.H. Rev. Stat. Ann. § 169-D:2(II)(a) ("[c]hild in need of services" includes one "[w]ho is subject to compulsory school attendance, and who is habitually, willfully, and without good and sufficient cause

Notwithstanding the absence of a wilfulness component in their comparable statutes, Minnesota and New York have, in turn, interpreted their truancy provisions to require purposeful conduct. See Matter of the Welfare of B.K.J., 451 N.W.2d 241, 243 (Minn. App. 1990); Matter of Simon v. Doe, 165 Misc. 2d 379, 380-381 (N.Y. Fam. Ct. 1995). For example, the Minnesota Supreme Court has determined that under its "child in need of protection or services" framework, "[t]ruancy implies volitional conduct on the part of the child for which the child is responsible." Matter of the Welfare of B.K.J., supra. Thus, a "child who is absent from school in obedience to a parent's wrongful command should not be stigmatized or confused by an unwarranted truancy label."[17] Id. By inquiring whether the

---

truant from school"); 2017 Okla. Sess. Laws c. 254(8)(c) (S.B. 718) ("[c]hild or juvenile in need of supervision" includes one who is "willfully and voluntarily absent from school"); R.I. Gen. Laws § 14-1-3(9) ("[w]ayward" child includes one who is required to attend school and "willfully and habitually absents himself or herself from school"). Michigan has further held that a child's absences are not wilful, as required by its truancy statute, where they are attributable to illness and fear of bullying, as "Michigan courts must infer a criminal intent for every offense in the absence of an express or implied [l]egislative intent to dispense with criminal intent" (citation omitted). In re Napieraj, 304 Mich. App. 742, 747-748 (2014).

[17] See Matter of Simon v. Doe, 165 Misc. 2d 379, 380-381 (N.Y. Fam. Ct. 1995) (New York's "person in need of supervision" statute requires "[an] intentional failure to attend school" for purposes of truancy; therefore, child with extreme anxiety-based school phobia who was not attending school was not in need of supervision because her will was "overborne by anxiety").

child is responsible for his or her own conduct, and not simply whether the child is acting intentionally, Minnesota's instructive approach seeks to ascertain the underlying reason for the child's absences.

d. <u>Wilfulness under the CRA statute</u>. In order to effectuate the Legislature's goals, the phrase "willfully fails to attend school," as used in the CRA statute's habitual truancy provision, must require more than voluntary or intentional conduct. The primary concern of the truancy provision is to target children who are, for instance, "playing hooky" or beyond their parents' control. Cf. <u>Matter of the Welfare of L.Z., C.R.P., & S.L.P.</u>, 396 N.W.2d 214, 218 (Minn. 1986) ("The classic case of truancy is the child sent to school by his parents, who then skips"). We conclude that a child "willfully fails to attend school" when he or she acts purposefully, such that his or her behavior arises from reasons portending delinquent behavior.[18] Ascertaining the child's purpose in failing

---

The Vermont Supreme Court declined to adopt Minnesota's approach because it determined that the language of the Vermont statute defining a truant as one who, "being subject to compulsory school attendance, is habitually and without justification truant from school," did not imply a volitional element. See <u>Matter of A.V., S.T., A.C., & E.V.</u>, 176 Vt. 568, 571 (2003).

[18] Even in such cases, the intervention and other services contemplated under the CRA statute may be a more effective method of changing the child's behavior than bringing the child

repeatedly to attend school allows the court to focus on whether the behavior is such that it can and should be deterred, and on whether the child's home circumstances are such that the court should change, or place conditions on, the child's custody arrangements. See G. L. c. 119, § 39G (choices available to Juvenile Court judge in CRA proceedings concern only custody, and provision of services may be merely conditions of custody). See also Oscar F. v. County of Worcester, 412 Mass. 38, 41 (1992) (statute "is concerned with social and family problems. It does not make the kind of education that a child receives a central judicial concern").

We emphasize that a finding of wilfulness is a fact-based inquiry that will depend on the circumstances of each case. Not every case involving a mental or physical disability necessarily will shield a child from a finding of wilfulness, since not every disability affects a child's ability to attend school. Each child's purpose or reasons for missing school should be examined individually in order to determine whether the absences are wilful beyond a reasonable doubt. Given their experience with juveniles and with delinquency matters, Juvenile Court judges are uniquely situated to assess whether the child's

---

into court. The design of the CRA statute, with its emphasis on community-based resources, indicates that the Legislature envisioned a deliberate set of escalating measures, in which court intervention would be the last alternative.

reasons for regularly missing school are of the concerning nature that would portend delinquency and call for deterrence.

e. _Application to M.P._  With this definition in mind, the evidence in the record does not support a finding beyond a reasonable doubt that M.P. "willfully fail[ed] to attend school."  Even assuming that the judge correctly determined that M.P.'s acts of staying home were voluntary or intentional, it is uncontested that her purpose was to address her bladder condition and associated mental and emotional impairments. While M.P. was not "home bound" per se, nor exempt from school, nothing of record suggests that M.P.'s behavior exhibited problems or tendencies that could lead toward juvenile delinquency.  To the contrary, the Juvenile Court judge acknowledged that M.P. desired to go to school, and it is undisputed that M.P. was saddened by her inability to do so. Even during the short period when she established a routine with the in-home service provider, M.P.'s bladder condition still interfered with her ability to leave the house.

Nor do the judge's findings and the record show that a modification of her custody arrangements would help improve M.P.'s attendance record.[19]  Cf. Matter of Benjamin A., 2011 N.Y.

---

[19] If, unlike here, a child's absences were the result of parental neglect such that the child's truant behavior was not found to be wilful, the child could not be adjudicated a child

Slip Op. 52217, at n.14 (N.Y. Fam. Ct. Oswego County Sept. 26, 2011) (unreported) ("Even if the Court could find otherwise, a [person in need of services] label is not going to get Benjamin to school.  All the services he needs to be successful are available to him through the school district and diversion services.  If those services do not . . . work and Benjamin does not attend school, what could this Court do but remove[] him from his family and place him into an ill-prepared and overworked juvenile justice system").

We note that an incorrect CRA adjudication is not without consequences.  Even where, as here, there is no change in custody, such a finding can be harmful in at least two respects.  First, CRA proceedings could affect parents' custodial rights in the future; courts have considered such proceedings in care and protection cases when terminating parental custody.  See, e.g.,

---

requiring assistance by virtue of habitual truancy and the matter of appropriate custodial arrangements accordingly could not be addressed pursuant to that statute.  That being said, however, the matter of parental neglect and custodial arrangements for the child may be addressed in care and protection proceedings brought in the Juvenile Court pursuant to G. L. c. 119, §§ 24, 26.  Such proceedings may be brought on behalf of a child who "(a) is without necessary and proper physical or educational care and discipline; (b) is growing up under conditions or circumstances damaging to the child's sound character development; (c) lacks proper attention of the parent, guardian with care and custody or custodian; or (d) has a parent, guardian or custodian who is unwilling, incompetent or unavailable to provide any such care, discipline or attention." G. L. c. 119, § 24.

Care & Protection of Sam, 87 Mass. App. Ct. 1106 (2015);

Adoption of Odessa, 76 Mass. App. Ct. 1118 (2010). Second, as

discussed, the CRA statute was amended specifically to minimize

children's exposure to the Juvenile Court unless court

involvement is necessary, in order to prevent the stigma and

other negative consequences of premature court involvement. In

this case, the evidence showed that the CRA proceedings worsened

M.P.'s condition and increased her anxiety, stress, and

sadness.[20]

The evidence of record does not support a finding beyond a

reasonable doubt that M.P. "willfully fail[ed] to attend

school." Accordingly, the judgment must be vacated and set

aside. The matter is remanded to the Juvenile Court for entry

of an order dismissing the CRA petition.

So ordered.

---

[20] We note that the Bureau of Special Education Appeals may have been a more appropriate venue in this case to ensure that M.P. was receiving an adequate education. See G. L. c. 71B, § 2A. This administrative body has authority to provide "adjudicatory hearings, mediation and other forms of alternative dispute resolution" concerning "any matter relating to the identification, evaluation, education program or educational placement of a child with a disability or the provision of a free and appropriate public education to the child." Id.